MARY A. PEET, complainant,

*v.*

CHARLES A. DE ARNAUD and SUSAN S. DE ARNAUD, his wife,
defendants.

Complainant owning certain vacant lots situate at a distance from her residence, of the value and size of which she was ignorant, but supposed them to be one hundred by twenty-five feet each, solicited the defendant C. A. D. to assist her in finding a purchaser for them, which he undertook to do. He ascertained their size to be one hundred by fifty feet, and obtained an offer for them of $100 a lot, and at once, and without informing complainant of their true size or value, told her he had sold them on her account at $45 per lot and would pay her $40 per lot, retaining the difference for his trouble and expenses, and upon that statement obtained from her a conveyance to himself at that price.—*Held*, the conveyance must be set aside and a reconveyance decreed.

Final hearing on bill, answer and proofs in open court.

*Mr. Stephen B. Ransom, Mr. Addison Ely* and *Mr. W. H. Ely* (of New York), for the complainant.

*Mr. Thomas M. Moore,* for Mrs. de Arnaud.

*Mr. James M. Van Valen.* and *Mr. Abraham D. Campbell,* for Mr. de Arnaud.

PITNEY, V. C.

By deed dated August 20th, 1889, the complainant conveyed to the defendant Charles A. de Arnaud twenty-six lots of land, fifty feet front by one hundred feet deep, situate at East Orange, Essex county, and by deed dated the 24th of August C. A. de Arnaud conveyed them through a third party to his wife, Susan S. de Arnaud.

The complainant, by her bill, asks the court to declare all these conveyances fraudulent and void as against her, and to decree a

Peet *v.* Arnaud.

reconveyance to her on payment by her to the defendants of the amount—$1,040—actually paid to her by them, or one of them, for the lots.

The consideration named in each of the deeds is $1.

The substance of the fraud charged by complainant is, that in the transaction in question the defendant C. A. de Arnaud acted as the friend and agent of the complainant, and undertook, as such, to try to find a purchaser for the lots in question; that the complainant was ignorant as to their value and under a misapprehension as to their size, supposing them to be twenty-five feet by one hundred feet each, when in fact they were fifty by one hundred feet each; that defendant C. A. de Arnaud ascertained their actual size and real value, and that after he had received an offer for them of $100 per lot, represented to her that he had contracted to sell them on her account for $45 per lot, demanding the difference of $5 per lot for his commissions and expenses. And as to the defendant Mrs. de Arnaud, complainant alleges that she had notice of the fraud practiced on complainant by her husband, and that the conveyance to her by her husband was without consideration moving between the parties, and that the husband in the principal transaction acted as the agent for his wife and used her money in paying the complainant, and that Mrs. de Arnaud has parted with no money on the strength of the conveyance except that paid to the complainant, which she is ready to return.

The defendants sever in their answers, the husband denying all confidential relations and misrepresentation and concealment, and the wife alleging that she paid her husband $3,000 in cash for the lots in good faith and without any notice of any fraud.

The case as developed at the hearing is as follows:

The complainant is a single lady, living with her mother, a widow, at Washington, D. C. In the lifetime of her father the family lived in New York city, or its neighborhood. Among the assets of her father's estate were these Orange lots, which had been taken by him for a debt, and which were conveyed by the executors of his will to her mother and by her to the complainant. She had never seen them, except on one occasion when she

drove past them, and knew nothing about their value except a note or two which she had received from real estate agents in the neighborhood, and the amount at which they were assessed for purposes of taxation, and the necessity of paying the taxes with unrelenting regularity. The description in the deed did not disclose their size, though it could have been determined therefrom with ease by a surveyor or engineer. She had a rough plot of them, not drawn to a scale, showing, among others, her lots, marked with a "P," which was equally silent as to their size, unless it might be inferred from the figures "50" written on two adjoining lots, apparently of the same size as her own.

Among the acquaintances of complainant's mother while living in the vicinity of New York were a Mr. and Mrs. Fisher, persons I infer of about the same age with her. In 1885, and after Mrs. Peet and her daughter had removed to Washington, Mr. Fisher died, leaving his widow a handsome fortune. She also came to Washington, and there met, and in January, 1888, married, her present husband, Charles A. de Arnaud, some twelve years at least her junior, he being at that time about fifty-five years old, and she, as he swears, some sixty-seven years old. The husband claimed to be a Russian by birth, and a civil and military engineer by profession, and to have served in the Federal army in the late war, and to have been wounded in such service, and to have a large claim against the government arising out of his military services, and he received the title of " colonel."

The defendants after their marriage lived in Washington in winter, and at Carlton Hill, near Rutherford, Bergen county, in the summer. Mrs. Peet and Mrs. de Arnaud renewed their acquaintance in Washington and visited each other there, and thus arose the acquaintance between the complainant and defendant Colonel de Arnaud.

In the latter part of May, 1889, just before defendants were about to leave Washington for Rutherford for the summer, on the occasion of a visit of the defendants to Mrs. Peet—according to the evidence of complainant and her witnesses, whose account I shall in the main follow—the subject of the summer sojourn of the defendants at Rutherford was mentioned, and complainant

Peet v. Arnaud.

asked how far that was from East Orange and could Colonel de Arnaud find out anything about her lots and find a purchaser for them. He replied that he would do what he could with pleasure and without charge, and remarked that he thought of doing something in real estate in Jersey. At the same time complainant disclosed her ignorance of their value and her anxiety to sell them on account of the heavy burden of taxes they imposed upon her.

The complainant has fixed this interview as taking place in the latter part of June, but that she is mistaken, and it took place earlier, appears from a letter she received from Colonel de Arnaud dated June 3d, at Carlton Hill, in which he writes as follows:

"Your favor I have received   [The letter here acknowledged is not produced by the defendant.] And in reply I beg to say if you will send me the *prize* for your lots in East Orange, N. J., I will submit the same to a party, as to make an offer for them is out of the question for you wish to sell, hence you are the one to name the *prize* and the party wishing to purchase to *aprove.*"

The remainder of the letter shows that the defendants were already settled down for the season at Carlton Hill, but proposed shortly to make a brief visit to Washington.

Between the receipt of that letter and July 6th, probably on July 4th, complainant either sent or handed to Colonel de Arnaud, at his request, several letters which she had received from real estate agents in regard to the lots and some tax receipts. She also, at his request, made a copy on tracing-cloth of the rough map she had of the lots and sent or handed both to him. He gave as a reason for wishing two copies of the map that he needed an extra copy to hand to prospective purchasers. On this tracing-cloth plot is marked in the complainant's handwriting "25x100." These figures were made apparently with the same pen and ink and at the same time as the other pen-work on the map. She swears she supposed that was their actual size, and so told and wrote Colonel de Arnaud.

On July 6th Colonel de Arnaud wrote her a letter purporting to be from his wife, and signed with her name, and addressed to

the complainant, which acknowledges the receipt of a letter from the complainant of the 4th instant (not produced) and further on says :

"The colonel has submitted your plan and price for those 26 lots of yours in East Orange to a gentleman, who promises him to go there and make him an offer for them, but as yet the colonel has not received any news from him. The colonel wishes me to ask you what do you mean by saying in your letter 'We are not going to pay the enormous taxes any longer and we let it go?' We have not yet been in Orange on account of the rain we have had here."

It appeared in the course of Colonel de Arnaud's examination that this letter from complainant to him of the 4th of July was in the hands of his counsel, but it was not produced.

About the 1st of July the colonel called on Mr. Addison Ely, a practicing lawyer at Rutherford, who was, and is, also interested in a real estate agency at that place with Mr. Cooke Conkling, and handed him the tracing-cloth map of the lots and asked him if he was acquainted with East Orange property (East Orange being about seven miles from Rutherford) and said: "There are some lots I have for a friend of mine for sale. If you can sell them, you can make something out of it."

Mr. Ely knew substantially nothing about the lots and so told Colonel de Arnaud, but he wrote to a real estate agent in East Orange—Mr. S. M. Long—calling his attention to them, and on one of the last days of July received from him an offer of $80 per lot. On August 1st he received a letter from Colonel de Arnaud, dated at Saratoga Springs, where he was stopping with his wife, in which he inquires—

"Have you heard anything from the E. Orange lots? Let me know, in order to enable me to treat with the owner. * * * I want to know for certain what we can get for the East Orange lots, in order for me to close with the owner."

On August 1st Mr. Ely wrote the colonel that he had received a proposition to purchase the lots at $80 per lot, $500 down and balance on mortgage. To this Colonel de Arnaud answered, under date of August 2d, acknowledging the receipt of Mr. Ely's letter of the 1st, and saying—

, " Close with him the transaction at $80 per lot if you can get no more, but try to get more down than $500. I am perfectly satisfied to let the balance remain at 5 per cent. for one year, secured by a first mortgage on the lots."

The colonel wrote to the complainant, under date of August .1st, as follows : " I have this day received a letter about the E. .Orange lots, and as I will be in Washington next week I will .submit that letter to you."

No such letter ever was submitted by the defendant to the complainant, and it was not shown at the hearing that the colonel's letter to her could have referred to any letter except that from .Ely to him of August 1st.

The colonel called on Mr. Ely on the 5th of August. In the meantime Mr. Ely had induced Mr. Long to increase his offer to $100 per lot, or $2,600 for the whole number, and so informed the colonel at the interview of August 5th, who accepted the offer.    He at that interview told Mr. Ely that the owner was willing to take $1,900 for the lots and let him and Mr. Ely make the balance, and that he would deduct $100 for his expenses in visiting Washington &c., and would divide the balance of $600 with Mr. Ely.

On the strength of Colonel de Arnaud's instructions, Mr. Ely entered. into a written contract with Mr. Long's party, who was his son-in-law, Mr. Hare, to sell him the lots at $2,600, and received a small payment in cash on account.

· Colonel · de Arnaud proceeded the same day or evening to .Washington, and the next day, August 6th, called on the complainant, stated to her that he had sold the lots to a party at .Rutherford, or in that neighborhood, at $45 per lot; that he wished $5 per lot for his trouble and expense in carrying through the sale, and so would pay the complainant $40 per lot.    The colonel had called on the complainant about the middle of July and had urged her to let him sell the lots for her, mentioning the price he could get for them at $40 to $45 a lot, and he now urged her to sell at that price, stating that the purchaser, in order to make a profit, would be obliged to retail the lots out to purchasers upon a small cash payment and take long mortgages for most of the purchase-money.    The complainant half assented to

the sale, and handed to him her deed for use in preparing the deed to him. He returned at once to Rutherford, and handed the deed to Mr. Ely, with instructions to prepare one to him from the complainant, which was done. This deed was ready on Sunday, the 11th of August, and was forwarded to the complainant by Colonel de Arnaud with a letter dated August 10th, requesting complainant to execute it and forward it to a bank or trust company in New York, with instructions to deliver it to him upon payment of $1,040. Complainant acknowledged receipt of this deed in a letter which is not produced by the defendants.

She did not execute the deed at once, but made inquiries of a Mr. Maddox, produced as a witness by the defendant, as to Colonel de Arnaud's responsibility and reliability. Mr. Maddox seems to think the inquiry was as to his pecuniary responsibility, but I am well satisfied it was aimed at the reliability of his statements, since she did not propose to trust to the former but did to the latter. She evidently was undecided whether to convey or not, and wrote to Mr. Long, with whom she had no acquaintance, but had heard of as a real estate agent, asking the value of the lots. At the same time she was anxious to hold on to the sale proposed by Colonel de Arnaud if she could do no better. In this frame of mind, and on the 16th of August, she wrote to de Arnaud that she was going to New York the next week on Tuesday or Wednesday—which would be the 20th or 21st—and would see her trustee there about the sale and would then execute and deliver the deed, declaring, however, that she did not intend to recede from the bargain.

It would seem that this letter started Colonel de Arnaud to Washington. Obviously he did not wish her to come on to New York at that time, and he appears in Washington on the morning of the 20th, and at once called on the complainant and urged her to execute the deed. In so doing he again stated that he had already sold the lots at $45 each, and that the purchaser was waiting for his deed, and at the same time promised her that if after executing the deed she desired to buy back the lots she could do so by paying him $130 for his commissions and $20 for expenses, $150 in all. The inconsistency of this promise struck

her, but she says she did not ask an explanation because she did not like to seem ignorant of business. The colonel threw in her lap a roll of bills containing $1,040, and she drew and signed, upon ladies' note-paper, a receipt for it and then went out with him and executed and delivered the deed.

Before then Colonel de Arnaud was fully aware that the lots were fifty by one hundred instead of twenty-five by one hundred as Miss Peet supposed, but he did not set her right. It appears by the evidence adduced at the hearing that they were worth from $200 to $300 each.

Upon this statement of the case it seems too clear for argument that the complainant is entitled to relief as against Colonel de Arnaud. Confidential relations existed between them. She supposed that he was acting in her interest as her agent. He took advantage of that circumstance, and of her ignorance as to the size and value of the lots, to buy them at a grossly inadequate price upon a false representation as to their value and the price that the supposed actual purchaser was to pay for them. The rule applying to such a case is so familiar and supported by such a wealth of authority as to render citations useless. Among those referred to by complainant's counsel I cite a single one, viz., *Barker* v. *Harrison, 2 Coll. 566,* as precisely in point.

But the defendant Colonel de Arnaud denies, on the witness-stand, that he was acting in any respect as complainant's agent, or that he gave her any advice in the affair. He says that in May she offered to sell him the lots for $45 each, and that she knew and told him that they were fifty by one hundred feet in size, and that on July 12th he made a verbal bargain with her for an option to buy them at that price, for thirty days, and paid her $10 on account of it, and that his subsequent course was taken under that option. For reasons hereafter to be stated I place no reliance whatever upon his testimony; I consider it utterly worthless. But he produces the testimony of a General Burbridge, taken in the case at Washington, which does, in a measure, support Colonel de Arnaud and contradict the complainant. The substance of his evidence is, that he was, and had been since 1861, on intimate terms with Colonel de Arnaud;

that he had resided for twenty years in Washington and had a summer place at Saratoga; that he made complainant's acquaintance at Colonel de Arnaud's house in Washington, and that in May, 1889, shortly before leaving for Saratoga, he heard a conversation, or rather two or three conversations, between complainant and Colonel de Arnaud, in which the complainant spoke of these lots; said they were fifty by one hundred in size; that the taxes upon them were a great burden to her, and that she was anxious to sell them, and urged the colonel to buy them at $45 a lot, saying that there was a prospect of a new railroad reaching them, which would double their value. He further swears that Colonel de Arnaud did not accept the offer, but took it into consideration merely. The serious feature of this evidence is, that it shows knowledge by complainant of the size of her lots, and that it is denied *in toto* by her. She swears she never met General Burbridge in her life; would not know him if she met him, and that she had no such conversation in his presence or elsewhere. It is matter of regret that I have not had the advantage of seeing this witness under examination, and am compelled to judge of his reliability from his written testimony alone. Nothing, however, appears against him except his long intimacy with such a person as Colonel de Arnaud is shown to be. It is possible, however, that the last-named person has been able with his wonderful plausibility to deceive General Burbridge all these years, and I will give him the benefit of that possibility. But giving full credit to the honesty of this witness, still his evidence shows that no contract was made between the parties before the defendants left Washington for Rutherford, and it is not inconsistent with the existence of the agency, which not only appears from the letters of the defendant, but is inferable from the evidence of Mrs. de Arnaud, who swears that at Mrs. Peet's house at Washington—and if so, then, of course, in the spring before leaving for Rutherford—she heard a conversation between complainant and her husband about the lots, and her husband said "he had them for sale," and "I told him not to have anything to do with them, and Mrs. Peet said let them alone—let them talk about it." And, notwithstanding the positive evidence of

General Burbridge, I am satisfied that whatever may have been complainant's idea at that time as to the size of the lots, later on she was under the impression and belief that they were only twenty-five by one hundred in size.

Mr. Ely swears that he saw in Colonel de Arnaud's possession a letter he had received from the complainant—evidently the one of July 4th mentioned in de Arnaud's letter of July 6th above referred to, and not produced by the defendant—in which the complainant said that the lots were twenty-five by one hundred feet, and that she did not intend paying taxes on them any longer. The size of the lots was a matter of discussion between this witness and Colonel de Arnaud. The latter stated them to be fifty by one hundred, but Mr. Ely was staggered by Miss Peet's letter and the figures on the tracing-cloth map. Finally the matter was set at rest by Mr. Long, who knew their size.

The complainant is to some extent supported in her evidence by her mother and a Mrs. Clark. The mother swears that she heard the colonel and her daughter talking about the lots in July, and her daughter told him the lots were one hundred feet deep and she thought they were twenty-five feet wide. She further swears that on the 6th of August she heard the colonel say he would give her $40 a lot and sell for $45, making a profit of $5 a lot, and she could have them back by paying the profit of $5 a lot and the expenses he would incur. And just here it must be observed that the complainant first heard of the fraud practiced on her on August 23d, three days after she executed the deed, and at once telegraphed the colonel as follows: " I would like to buy the lots back on the terms agreed upon in the presence of my mother—$150. Answer, please, to-day." She also wrote him to the same effect.

It seems to me highly improbable she would have sent such a telegram and written such a letter if there had not been some foundation for her belief that the colonel had promised to reconvey.

Mrs. Clark swears that she was present and heard parts of two interviews between complainant and Colonel de Arnaud about these lots—the first in July and the second in August, before the

Peet v. Arnaud.

10th, evidently on the 6th. At the first interview he spoke of selling the lots for the complainant, and urged her to permit him to do so; at the second he stated that he had sold them for her, and wished her to make and execute a deed to him, so that he could convey to the purchaser.

Upon the whole evidence, I am satisfied that the case is in substance as I stated it above, and that the complainant's equity is clear as against Colonel de Arnaud.

The next question is as to the effect of the conveyance by the colonel to his wife.

The insistment of complainant in this behalf is three-fold—— *first*, that throughout the transaction the colonel was acting in his wife's interest and operating with her money; *second*, that she knew he was practicing a fraud on complainant; *third*, that the conveyance was without any consideration passing between the parties, and was made for the purpose of completing the fraud against the complainant.

Turning to the facts, and commencing with the delivery of the deed on August 20th, Colonel de Arnaud seems to have stopped at Trenton on his way home with his deed on August 21st, as it bears the certificate of the secretary of state of that date to the genuineness of the commissioner's certificate of acknowledgment. On the 22d, about noon, he presented himself at Mr. Ely's office, and said he was ready to make a deed to Mr. Long's party at the price named if he would pay the whole consideration in cash by two o'clock. He stated that his wife had furnished the money to pay for the lots, and that she refused to convey unless at least the amount she had advanced was paid in cash; that she was the capitalist, and must be protected. Mr. Ely offered to pay the $500 at once, but, of course, was not ready to comply with the new terms, and remonstrated with the colonel, but in vain. He declared the bargain off unless these new terms were complied with. Mr. Long lived seven miles away, and the sudden demand was of course a surprise. The next morning, Friday, August 23d, both the defendants started from their home at Rutherford between nine and ten o'clock and drove in a carriage either by way of Orange or directly to Newark; put the complainant's

Peet v. Arnaud.

deed on record at 11:30, and Colonel de Arnaud, either before or immediately after that hour, went to the office of Mr. Edward M. Colie and ordered a conveyance prepared from the husband to the wife at once, and the consideration to be $1. This date and hour is fixed beyond all peradventure by Mr. Colie and his clerk, Mr. McGowan. The defendant then drove to Orange and went with his wife to see the lots, spent the night at a hotel in Orange, returned with his wife to Newark on Saturday, the 24th, and there the colonel executed the conveyance to Mr. McGowan, the conduit, and he executed the deed to Mrs. de Arnaud, and both were lodged for record a little after noon on that day.

, The important feature of these facts is, that directions for the transfer of title for a nominal consideration from the husband to the wife were given in the forenoon of Friday, the 23d of August. The story of the colonel on the stand is, that he drove to Orange, left his wife at the hotel, then drove to Newark and left his deed for record, then returned to Orange, went with his wife and looked at the lots, then returned to the hotel and proposed to sell them to her, and on that afternoon or evening the bargain was struck that she was to pay him $3,000 for them. There is no pretence either in his or her evidence that previous to the afternoon of the 23d the idea of selling the lots from him to her had ever been broached between them.

He further states that the next morning, Saturday, the 24th, they went together to Newark, there for the first time ordered and procured the conveyances to be prepared and executed, took them to the registrar's office, and there in the street, before handing them to the registrar, his wife paid him $3,000 in three $1,000 bills. The wife swears that the money was paid at the hotel in Orange the previous day.

The evidence of both is entirely inconsistent with the well-established fact that the order for the conveyance for a nominal consideration was given on Friday morning. Besides, the whole story is to the last degree improbable, and to my view grotesquely absurd. The evidence of Mrs. de Arnaud is painfully self-contradictory. I do not propose to go through it in detail. They both swear that the $3,000 was drawn on the check of the wife

33

on a Washington bank by the colonel, on August 6th, in three $1,000 bills, which he handed to his wife about the 8th of August, and which she carried on her person from that time until the 24th, and they produce a check for the amount named drawn on the Washington bank, with the date altered from July 5th to August 5th and stamped paid August 6th. But when the complainant attempted to examine the officer of the bank at Washington, he declined to be sworn on the subject without a special order of the court of that city, unless the defendants would consent to his being sworn, which their counsel declined to do. If, as they allege, this check was paid in three $1,000 notes, it is difficult to see what objection they could have to the bank officer swearing to it.

Again, Colonel de Arnaud was pressed to tell what he did with this large sum of money in addition to a sum of $3,000 received, as he swore, about the same time from his estate in Russia, and his answers on this subject were unsatisfactory to the last degree. He swore that out of these moneys he paid between $1,000 and $2,000 to his wife—who had just paid it to him—in repayment to her of money he had previously borrowed from her. But she swore she had never loaned him more than $10 or $15. He further swore that he paid nearly $2,000 of it to his counsel, Mr. Coleman, in Washington, to whom he was largely indebted for professional services rendered by him as counsel in conducting his claim against the government. But Mr. Coleman, when put on the stand by the complainant in Washington and asked about this payment, declined to answer because, as he said, the payment of money by a client to his counsel was a privileged communication.

Bearing on the wife's connection with this transaction is the evidence of Mr. Ely, who swears that on Sunday, August 11th, he drove to Colonel de Arnaud's house with the deed he had prepared from complainant to the colonel, and met and conversed with him and his wife about the proposed transaction, and that during a moment's absence of the colonel Mrs. de Arnaud winked at him and said : " I put the colonel up to that."

Mr. Ely and Mr. Conkling further swear that throughout the

Peet *v.* Arnaud.

transaction the colonel said that he had no money, and that his wife was the capitalist and was to furnish the money to carry the thing through, and must be taken care of.

On the 23d of August Mr. Long tendered $500 in cash to Mrs. de Arnaud at her house, and demanded a conveyance in accordance with his contract, and Mr. Ely wrote her a letter urging her to fulfill it. The same or the next day the colonel received the telegram from the complainant above set forth, and also a letter from her of that date demanding a reconveyance to her.

After this, on the 28th of August, Mrs. de Arnaud called on Mr. Conkling and returned to him a policy of insurance he had issued to her on the colonel's instruction, and then said to Mr. Conkling that she intended after that to attend to her own busi- ness and not trust the colonel with it; that he had got her into trouble about these Orange lots.

The defendants in argument asked me to disregard the evidence of Messrs. Ely and Conkling, on account of their interest in the event of this cause. Mr. Ely frankly admitted that complainant had promised to carry out the contract he had made, by Colonel de Arnaud's instructions, with Mr. Long's party, and that he expected to receive the commission he was to receive under that agreement. This, of course, renders it necessary to scan the evi- dence of these witnesses with care, and I have done so, and find no reason to doubt their reliability.

Colonel de Arnaud was asked on the stand where he got the $1,040 which he paid to the complainant, and swore that he received it on the same day (August 6th) from Mr. Green, of Green & Bateman, brokers, Washington, D. C., in payment of a $1,000 government bond which he sold to them. Messrs. Green & Bateman are brokers and bankers in New York city, with a branch in Washington, which was at that time managed by a Mr. Green, not a member of the firm. The partner of that name was seldom, if ever, in Washington.

Colonel de Arnaud further swore that he was a man of wealth, receiving an annual income of $2,000 or $3,000 from his paternal estate in Russia, which was remitted to him uniformly in Bank of

England notes by registered letters; that these remittances were made to him by his brother from no particular place, but from any of the towns or cities of Europe where his brother might happen to be.   He said that in the summer of 1889 he received from his brother a remittance of one £500 Bank of England note and two £20 notes in a registered letter, which he said he still had in his pocket, but did not produce, and that he sold the government bond and exchanged the English notes at the same place, namely, Green & Bateman's, in Washington, D. C.   But Mr. Green, the manager of Green & Bateman's office, swore that no such transactions as those stated by the colonel occurred.   He did not know Colonel de Arnaud and had no such transactions with him.

The colonel swore that his estate in Russia was owned by himself and his brother and two sisters; that he was born and reared on it; that it contained about one hundred and fifty thousand acres, and was situate near Mitau, the capital of the Baltic province of Courland.   He said it was about seven or eight miles long and about six or seven miles wide.   Such a sized tract would contain only about thirty thousand acres, while it would require one at least fifteen miles square to contain one hundred and fifty thousand acres.   The colonel's attention was called to this on the stand, but he ventured no explanation.

There are many other serious contradictions and absurdities in his evidence sufficient alone to destroy its value.   But complainant, not satisfied with this, attacked him from without.   He introduced himself on the stand as follows:

"I reside in Washington, and at Carlton Hill in the summer; I am fifty-nine years old, and am a retired military engineer officer; I came to Bergen county in January, 1888; prior to that I had lived at Washington for thirty-two years; I was in the army in the late war; I held the position of colonel of the Second Missouri, and was afterwards attached to General Fremont's staff and General Grant's; I hold now a retired major in the Russian army."

He afterwards stated it was the Second Missouri cavalry of which he was colonel.   Further on he stated that he held a commission as captain in the Fifth Missouri volunteers; and, on the examination of his own counsel, he produced a certificate of mem-

Peet *v.* Arnaud.

bership in, and transfer card from, a post in the Grand Army of
the Republic, in which is this statement:

" Comrade Charles A. de Arnaud  *  *  *  entered the service on the 13th
day of May, 1861, as a captain Company F, 5th regiment Missouri volunteers,
and was finally discharged on the        day of August, 1861, as captain Com-
pany F, 5th regiment Missouri volunteers."

Previous to the production of this document he had sworn, on
cross-examination, that he knew that the records showed that the
captain of company F, Fifth Missouri volunteers, was commis-
sioned as "Alfred Arnaud," and he swore most positively that
he was the identical Captain Alfred Arnaud who was so commis-
sioned.  But he produced no commission, either as colonel or
captain, and no certificate of discharge, and said he had not pre-
served them.  He further said that he was seriously wounded in
the service and had a large claim against the government on
account of it.

The complainant, in view of these statements, attacked, at great
expense, their truth, by depositions of witnesses taken in Mis-
souri and Arkansas.  By these depositions, in connection with
the colonel's own cross-examination, it clearly appeared that the
"Alfred Arnaud " who was commissioned as captain of company
F, Fifth Missouri volunteers, was, before the war, a practicing
physician in Carondelet, now a part of St. Louis, and that he is
now living at Hot Springs, Arkansas, practicing his profession ;
that he served with his company and regiment throughout its
three months' enlistment; that no other person named "Arnaud "
was ever connected with that regiment ; that the defendant herein
was never colonel of any Missouri regiment ; and that he never
held any commission in any regiment; but that if he held any
at all, it was a formal one given him by General Fremont after
the discharge and disbandment of the Fifth Missouri, in order
to subject him to military government ; that he never was in the
army ; that all the service he ever rendered the government was
that of a spy to make a single expedition into the enemy's line
in the fall of 1861 ; that if ever he received any wound, it was
in some kind of a street brawl within the enemy's lines, and not

in action; that he applied to the government for compensation for his services as a spy, and received in full therefor $2,000 in 1862, or thereabouts.  After that he appears to have disappeared from this country, being absent, by his own account of himself, in Europe for treatment for his disabilities arising from his wound; that he turned up in Washington in 1885, or thereabouts, and in 1886 made application for a pension, in which he swore that he was the identical Captain Alfred Arnaud who served as captain of company F, Fifth Missouri volunteers, and that he has since been a constant suitor for recognition and compensation for those services.  In short, it abundantly appears by his own examination, as well as by the most convincing proofs adduced by the complainant, that Charles A. de Arnaud is something quite different from what he pretends to be—and a person quite capable of the fraud here charged against him.  At the same time his appearance and manner on the stand show that he has enough plausibility and address to be quite dangerous to a weak woman like the complainant.

Turning again to the question of the value as against complainant of the conveyance from the husband to the wife, I am satisfied from the evidence, as well the items already referred to as from a view of the whole case, that the wife was cognizant of the true character of the transaction between the complainant and her husband; that she furnished him the money to carry it through, and that no money or other valuable thing was paid by her to him as a consideration for the conveyance; that it was contrived for the purpose of perfecting the fraud, and must be declared void as against the complainant.

I will so advise.